**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Email: aapton@zlk.com
445 South Figueroa St., 31st Floor
Los Angeles, CA  90071
Tel:  213/985-7290
Fax:  202/333-2121

*Attorneys for Lead Plaintiffs and the Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE REGULUS THERAPEUTICS INC. SECURITIES LITIGATION | **Master File No. 3:17-cv-00182-BTM-RBB**<br><br>**CLASS ACTION**<br><br>**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>Demand for Jury Trial</u> |

Lead Plaintiffs Mark Appel and Michael Spitters ("Plaintiffs"), by and through undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation made by and through Plaintiffs' attorneys, which includes without limitation: (a) review and analysis of regulatory filings made by Regulus Therapeutics, Inc. ("Regulus") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Regulus; and (c) review of other publicly available information concerning Regulus.

Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE CLAIM**

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Regulus between February 17, 2016 and June 12, 2017, inclusive (the "Class Period"), and were damaged thereby (the "Class"). Plaintiff alleges that defendants Regulus, Joseph P. Hagan, Paul C. Grint, and Michael Huang, M.D. (collectively, "Defendants") violated the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78a, *et seq.* Plaintiffs seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

2.     Regulus is a biopharmaceutical company whose most advanced drug was RG-101, an anti-microRNA that targeted host factors for the hepatitis C virus, or HCV infection. RG-101 was revolutionary because it cut HCV treatment time in half to approximately 4 weeks, compared to other drugs on the market that took 8 weeks. However, because the HCV infection already had safe treatment, in order to get clinical approval, it was imperative that RG-101 was completely safe. As BMO Capital Markets stated in a June 2016 analyst report, "a clean safety profile is necessary to be competitive in HCV . . .."

3.     In order to determine the safety and efficacy of RG-101, Regulus conducted a Phase II study outside of the US in August 2015 that consisted of 79 people. The Phase II study administered RG-101 in combination with other antiviral agents.

4.     In January 2016, Regulus conducted a Phase I study in the US consisting of 24 people. The Phase I study explored RG-101 in hepatitis C infected patients with renal insufficiency or end-stage renal disease ("ESRD").

5.     The Class Period begins when Regulus announced they had a serious adverse event ("SAE") in the Phase II study. Eventually, Regulus would announce that the SAE was jaundice, caused by too much bilirubin in the blood.

6.     Throughout the Class Period Defendants issued a series of half-truths designed to mislead investors as to the mechanism of the jaundice and the safety of their signature drug RG-101.

7.     In June 2016, Defendants would announce a second SAE of jaundice, this time in the Phase I study. The FDA immediately issued a clinical hold and requested pre-clinical and clinical study information from Regulus.

8.     Despite having internal information and reports to the contrary, Defendants continued to claim that the cases of jaundice (hyperbilirubinemia) were not a product of RG-101, but that the patients were predisposed to jaundice for a variety of other reasons.

9.     These misrepresentations allowed defendants to seek significant rewards via bonuses, salary, and other forms of compensation. Additionally, Regulus was able to secure a $30 million debt financing agreement, in part due to the benefits of RG-101.

10.     As a result of these misrepresentations, Plaintiffs and other members of the Class were tricked into purchasing Regulus common stock at artificially inflated prices. When the truth about the safety of RG-101 was revealed to the market, the stock price plummeted. As a result, Plaintiffs and the Class members were harmed.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act, 15 U.S.C. §78aa.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

14.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiffs Mark Appel and Michael Spitters purchased Regulus common stock at artificially inflated prices during the Class Period and were damaged upon the revelation of the Defendants' fraud. Plaintiffs' certifications evidencing their transactions are attached to their motion for appointment as Lead Plaintiff and are incorporated by reference.

16.     Defendant Regulus is a Delaware corporation with its principal executive offices located at 10614 Science Center Drive, San Diego, CA 92121. Regulus' common stock trades on NASDAQ under the ticker symbol "RGLS."

17.     Defendant Paul C. Grint, M.D. ("Grint") was Regulus' Chief Executive Officer ("CEO") and President since June 1, 2015, and prior to that was Regulus' Chief Medical Officer since June 2014. Grint left Regulus on May 4, 2017, and was replaced as CEO by Defendant Joseph P. Hagan. From February 2011 to June 2014, Dr. Grint served as the President of Cerexa, Inc., a wholly owned subsidiary of Forest Laboratories, Inc., a pharmaceutical company, where he was responsible for the oversight of anti-infective product development. Before that, Dr. Grint served as Senior Vice President of Research at Forest Research Institute, Inc., the scientific development subsidiary of Forest Laboratories, Inc., from January 2009 to February 2011, as Chief Medical Officer of Kalypsys, Inc., a biopharmaceutical company,

from 2006 to 2008, and as Senior Vice President and Chief Medical Officer of Zephyr Sciences, Inc., a biopharmaceutical company, during 2006. Dr. Grint also previously served in similar executive level positions at Pfizer Inc., IDEC Pharmaceuticals Corporation, and Schering-Plough Corporation. Dr. Grint has served on the board of directors of Synedgen, a privately held biopharmaceutical company, since December 2014 and AmpliPhi Biosciences Corporation, a publicly held biopharmaceutical company, since November 2014. Dr. Grint also served on the Board of Directors of Illumina, Inc. from April 2005 to May 2013. Dr. Grint received a B.S. in Medical Science from St. Mary's Hospital in London and his medical degree from St. Bartholomew's Hospital Medical College at the University of London. Dr. Grint is a Fellow of the Royal College of Pathologists, a member of numerous professional and medical societies, and the author or co-author of over 50 scientific publications.

18.   Defendant Joseph P. Hagan ("Hagan") was Regulus' Chief Operating Officer, Principal Financial Officer and Principal Accounting Officer between January 4, 2016, and May 4, 2017 until his appointment as CEO. From June 2011 through December 2015, Mr. Hagan served as the Executive Vice President, Chief Financial Officer and Chief Business Officer of Orexigen Therapeutics, Inc. From May 2009 to June 2011, Mr. Hagan served as Orexigen's Senior Vice President, Corporate Development, Strategy and Communications. From September 1998 to April 2008, Mr. Hagan served as Managing Director of Amgen Ventures. Prior to starting the Amgen Ventures Fund, Mr. Hagan served as Head of corporate development for Amgen Inc. Before joining Amgen, Mr. Hagan spent five years in the bioengineering labs at Genzyme and Advanced Tissue Sciences. Mr. Hagan has served on the board of directors of Zosano Pharma, a publicly traded biotechnology company, since May 2015. He received an M.B.A. from Northeastern University and a B.S. in Physiology and Neuroscience from the University of California, San Diego.

19.   Defendant Michael Huang, M.D. ("Huang") joined Regulus as the Vice President of Clinical Development on August 25, 2015. Dr. Huang served as Vice President, Clinical Development of Auspex Pharmaceuticals, Inc. (acquired by Teva Pharmaceutical Industries Ltd. in May 2015) and was responsible for providing project and clinical leadership across multiple programs focused on the treatment of central nervous system disorders.  Prior to Auspex, Dr. Huang served in medical leadership roles at Santarus, Inc., Spectrum Pharmaceuticals, Inc., Phenomix Corporation and Valeant Pharmaceuticals International. Dr. Huang received his Bachelor of Arts degree in molecular and cell biology from the University of California, Berkeley and an M.D. from the Chicago Medical School at Rosalind Franklin University.  He completed his residency training in family medicine at the University of California, Irvine and is Board Certified in primary care medicine.  Dr. Huang is the author or co-author of numerous peer-reviewed journal articles, abstracts and scientific publications.

20.   Defendants in paragraphs 17-19 are collectively referred to herein as the "Individual Defendants."

21.   Each of the Individual Defendants:

(a)   directly participated in the management of Regulus;

(b)   was directly involved in the day-to-day operations of Regulus at the highest levels;

(c)   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)   was directly or indirectly involved in the oversight or implementation of Regulus' internal controls;

(e)   was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning Regulus; and/or

6

(f)     approved or ratified these statements in violation of the federal securities laws.

22.     Because of the Individual Defendants' positions within Regulus, they had access to undisclosed information about RG-101, as well as Regulus' business and present and future business prospects via access to internal corporate documents (including Regulus' operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

23.     As officers of a publicly-held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to Regulus' drug candidates (especially RG-101), including progress and issues concerning the development of these drug candidates, and Regulus' present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Regulus' publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     The Individual Defendants, because of their positions with Regulus, possessed the power and authority to control the contents of Regulus' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of Regulus' reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being

7

concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

25.    Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Regulus common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public concerning RG-101's safety and potential for commercialization, and thus Regulus' business and intrinsic value of its common stock and (ii) caused Plaintiff and other shareholders to purchase Regulus common stock at artificially inflated prices.

## **RELEVANT NON-PARTY**

26.    Dr. Timothy Wright ("Wright") is and has been Regulus' Chief R&D Officer since joining Regulus in October 2016. From February 2015 through October 2016, he served as the Executive Vice President of Translational Sciences for the California Institute for Biomedical Research (Calibr), a not-for-profit translational research institute. Prior to Calibr, Dr. Wright held a variety of positions with increasing levels of responsibility over an 11-year period at Novartis Pharma most recently as Global Head of Development. Prior to Novartis, Dr. Wright spent three years at Pfizer holding leadership positions in Discovery and Clinical Sciences, leading translational research efforts and clinical trials for numerous programs across several therapeutic areas. Dr. Wright was trained as a physician-scientist at Johns Hopkins and had an accomplished academic career at both Johns Hopkins and the University of Pittsburgh before moving to pharma. He also serves as a key scientific advisor to several organizations, including the Bill & Melinda Gates Foundation.

# SUBSTANTIVE ALLEGATIONS

## A. Company Background

27.    Regulus is a biopharmaceutical company focused on discovering and developing drugs that target *micro*RNA to treat a broad range of diseases. Regulus has never generated any revenue from product sales and relies on equity investments to continue as a going concern.

28.    Throughout the Class Period, Regulus' most advanced drug was RG-101, an anti-microRNA that targeted host factors for the hepatitis C virus, or HCV infection. RG-101 worked by targeting miR-122, a highly conserved liver-specific substance that plays an important role in cholesterol and fatty-acid synthesis.

29.    RG-101 was revolutionary because it cut HCV treatment time in half to approximately 4 weeks, compared to other drugs on the market that took 8 weeks. However, because the HCV infection already had safe treatment, in order to get clinical approval, it was imperative that RG-101 was completely safe. As BMO Capital Markets stated in a June 2016 analyst report, "a clean safety profile is necessary to be competitive in HCV . . .."

30.    Regulus evaluated the safety and efficacy of RG-101 through Phase I and Phase II studies.

31.    In August 2015, Regulus initiated a Phase II study outside of the US designed to evaluate a four-week treatment regimen containing administration of RG-101 in combination with other antiviral agents. The Phase II study consisted of a total of 79 patients.

32.    Throughout the Class Period, Regulus continually informed the Class that RG-101 was safe and well tolerated. However, on April 15, 2016, Regulus announced for the first time that one of the patients enrolled in the Phase II study had a significant adverse event of jaundice.

33.    By the end of the Phase II study, out of the 79 patients that were enrolled, there was 1 significant adverse event of jaundice and four additional

9

patients that experienced adverse events of asymptomatic transient hyperbilirubinemia (greater than or equal to two times the upper limit of normal). This resulted in 6.3% of patients in the Phase II trial having an adverse event of hyperbilirubinemia to some extent.

34.    In January 2016, Regulus initiated a multi-center, open label, non-randomized comparative Phase I study designed to evaluate the safety, tolerability, pharmacokinetics and pharmacodynamics of RG-101, and further explore RG-101 in hepatitis C infected patients with renal insufficiency or end-stage renal disease ("ESRD").

35.    The Phase I study had three treatment arms and a total of 24 patients: (i) healthy volunteers (n=8); (ii) patients with severe renal impairment or ESRD (n=8); and (iii) HCV patients with severe renal impairment or ESRD (n=8).

36.    Although Regulus did not release the final numbers for the Phase I study, on June 27, 2016, Regulus received verbal notice from the U.S. Food and Drug Administration (FDA) that its Investigational New Drug (IND) for RG-101 for the treatment of HCV infection had been placed on clinical hold. The FDA initiated the clinical hold after Regulus reported a second serious adverse event (SAE) of jaundice in the on-going Phase I US study 117 days after the patient received a single dose of RG-101.

**B. Investigational New Drug Application Procedures: Clinical Hold**

37.    During the clinical study process, the FDA can issue a "clinical hold" under certain circumstances.

38.    A clinical hold is an order issued by FDA to the sponsor of an IND application to delay a proposed clinical investigation or to suspend an ongoing investigation. All or some of the investigations conducted under an IND application may be placed on clinical hold.

39.    The FDA may issue a clinical hold in several circumstances, including when human subjects are or would be exposed to an unreasonable and significant

10

risk of illness or injury; or the IND application does not contain sufficient information needed to assess the risks to subjects of the proposed studies.

40.     Whenever the FDA concludes that a deficiency exists in a clinical investigation that may be grounds for the imposition of clinical hold, the FDA will, unless patients are exposed to immediate and serious risk, attempt to discuss and satisfactorily resolve the matter with the IND applicant before issuing the clinical hold order. When a proposed study is placed on clinical hold, subjects may not be given the investigational drug. When an ongoing study is placed on clinical hold, no new subjects may be recruited to the study and given the investigational drug; patients already in the study are expected to be taken off therapy involving the investigational drug unless treatment continuation is specifically permitted by FDA in the interest of patient safety.

41.     Here, the FDA immediately imposed a clinical hold after the second reported incident of jaundice. The FDA did this because of the immediate and serious risk surrounding RG-101.

### C. RG-101 Was Prone to Hyperbilirubinemia

42.     The FDA initiated the clinical hold after Regulus reported a second serious adverse event of jaundice that occurred in the Phase I study.

43.     Jaundice occurs when there is too much bilirubin (a yellow pigment) in the blood—a condition called hyperbilirubinemia.

44.     Bilirubin is formed when hemoglobin (the part of red blood cells that carries oxygen) is broken down as part of the normal process of recycling old or damaged red blood cells. Bilirubin is carried in the bloodstream to the liver, where it binds with bile. Bilirubin is then moved through the bile ducts into the digestive tract, so that it can be eliminated from the body. Most bilirubin is eliminated in stool, but a small amount is eliminated in urine. If bilirubin cannot be moved through the liver and bile ducts quickly enough, it builds up in the blood and is deposited in the skin. The result is jaundice.

45.     Serious problems of jaundice can include:

- Ascites: Accumulation of fluid within the abdomen;

- Coagulopathy: A tendency to bleed or bruise;

- Hepatic encephalopathy: Deterioration of brain function because the liver malfunctions, allowing toxic substances to build up in the blood, reach the brain, and cause changes in mental function (such as confusion and drowsiness); and

- Portal hypertension: High blood pressure in the veins that bring blood to the liver, which can lead to bleeding in the esophagus and sometimes stomach

46.     Jaundice has many causes. Most causes involve disorders and drugs that: a) damage the liver; b) interfere with the flow of bile; or c) trigger the destruction of red blood cells (hemolysis), thus producing more bilirubin than the liver can handle.

47.     Typically, drugs that have high instances of hyperbilirubinemia and jaundice are deemed dangerous. This is referred to as Hy's Law.

48.     Hy's law is a rule of thumb that a patient is at high risk of a fatal drug-induced liver injury (DILI) if given a medication that causes hepatocellular injury (not cholestatic injury) with jaundice. The law is based on observations by Hy Zimmerman, a major scholar of drug-induced liver injury. Hy's Law is essentially a translation of Zimmerman's observation that pure hepatocellular injury sufficient to cause hyperbilirubinemia is an ominous indicator of the potential for a drug to cause serious liver injury.

49.     Briefly, Hy's Law cases have the following three components: 1) The drug causes hepatocellular injury, generally defined as an elevated alanine transaminase by 3 times or greater above the upper limit of normal. 2) Among subjects showing such aminotransferase elevations, they also have elevation of their serum total bilirubin of greater than 2 times the upper limit of normal, without findings of cholestasis (defined as serum alkaline phosphatase activity less than 2

12

times the upper limit of normal). 3) No other reason can be found to explain the combination of increased aminotransferase and serum total bilirubin, such as viral hepatitis A, B, or C; preexisting or acute liver disease; or another drug capable of causing the observed injury.

50.    Finding one Hy's Law case in the clinical trial database is worrisome; finding two is considered highly predictive that the drug has the potential to cause severe DILI when given to a larger population.

51.    Here, RG-101 resulted in 2 serious adverse events of jaundice. None of the hyperbilirubinemia cases met the criteria for Hy's Law because there were not "increases in the other enzymes that would meet that diagnosis." However, these results were still very troubling give that the bilirubin levels were high enough to meet Hy's Law.

52.    The jaundice and hyperbilirubinemia in patients taking RG-101 was directly caused by the RG-101 drug. Specifically, a "comprehensive preclinical investigation and detailed analysis of clinical data from the RG-101 program had identified the direct inhibition of a hepatocyte conjugated bilirubin transporter as the likely mechanism for the cases of hyperbilirubinemia in the RG-101 program. [Regulus] believe[d] that a combination of factors, including inhibition of conjugated bilirubin transport by RG-101, impaired baseline bilirubin transport in HCV patients and the preferential uptake of RG-101 by hepatocytes contributed to this mechanism."

53.    In other words, after a review of the ***pre-clinical*** data and information, Regulus terminated its RG-101 program because RG-101 inhibited the transport of bilirubin through the liver, resulting in dangerous levels of bilirubin in the blood. This inhibition led to jaundice and hyperbilirubinemia in the test patients.

54.    Despite knowing of, or being deliberately reckless to, the fact that RG-101 was prone to hyperbilirubinemia and jaundice, Defendants misled investors as to the safety of RG-101 and the cause of the jaundice.

### D. Defendants Misrepresented the Overall Safety Profile of RG-101

55.    Defendants materially downplayed the safety risks associated with RG-101. RG-101, because it inhibited the transport of bilirubin through the liver and caused jaundice and hyperbilirubinemia, posed a serious health risk for patients. Despite knowing that RG-101 was dangerous, Defendants repeatedly downplayed the health risks associated with it. Defendants' portrayal of RG-101 misled the market by preventing the public from accurately assessing the risks associated with RG-101, and Regulus in general.

<u>*February 17, 2016 – Press Release*</u>

56.    The Class Period begins on February 17, 2016 when Regulus issued a press release announcing the interim results from its ongoing Phase II clinical study evaluating RG-101. The press release stated in relevant part:

> LA JOLLA, Calif., Feb. 17, 2016 /PRNewswire/ -- Regulus Therapeutics Inc. (NASDAQ:RGLS), a biopharmaceutical company leading the discovery and development of innovative medicines targeting microRNAs, today announced interim results from one of the company's ongoing Phase II studies of RG-101 for the treatment of Hepatitis C Virus infection (HCV). The study was designed to evaluate a shortened, four-week treatment regimen containing a subcutaneous administration of 2 mg/kg of RG-101 at Day 1 and Day 29, in combination with 4 weeks of once/daily approved anti-viral agents Harvoni®, Olysio®, or Daklinza™. The study enrolled 79 treatment naïve genotype 1 and 4 HCV patients (Harvoni® arm, n=27, Olysio® arm, n=27, Daklinza™ arm, n=25). Thirty-eight patients have been evaluated through 8 weeks of follow up. Ninety-seven percent of those patients (37/38) had HCV RNA viral load measurements below the limit of quantification. ***To date, RG-101 has been generally well tolerated with the majority of adverse events considered mild or moderate, and with no study discontinuations.*** For those patients through 12 weeks of follow-up, 100% remained below the limit of quantification (14/14). The primary endpoint analysis (12 week follow up) for all 79 patients in the study are anticipated to be reported in late Q2 2016.

Emphasis added.

57.     In the Form 8-K filed with SEC on the same date, Regulus reiterated its earlier statements by stating:

> On February 17, 2016, we announced interim results from our ongoing Phase II clinical study evaluating RG-101, our wholly-owned GalNac-conjugated anti-miR targeting microRNA-122 for the treatment of hepatitis C virus infection, or HCV. The study was designed to evaluate a shortened, four-week treatment regimen containing a subcutaneous administration of 2 mg/kg of RG-101 at Day 1 and Day 29, in combination with four weeks of once daily approved anti-viral agents Harvoni®, Olysio®, or Daklinza®. The study enrolled 79 treatment naïve genotype 1 and 4 HCV patients (Harvoni® arm, n=27, Olysio® arm, n=27, Daklinza® arm, n=25). Thirty-eight patients have been evaluated through 8 weeks of follow up. Ninety-seven percent of those patients (37/38) had HCV RNA viral load measurements below the limit of quantification. ***To date, RG-101 has been generally well tolerated with the majority of adverse events considered mild or moderate, and with no study discontinuations.*** For those patients through 12 weeks of follow-up, 100% remained below the limit of quantification (14/14). The primary endpoint analysis (12 week follow up) for all 79 patients in the study are anticipated to be reported in late Q2 2016.

Emphasis added.

58.     Regulus also released a PowerPoint presentation on February 17, 2016 titled "Interim Phase II Results Webcast & Conference Call." The PowerPoint presentation misrepresented the safety of RG-101, stating in pertinent part: "Multiple injections of RG-101 in combination with oral agents were well tolerated in HCV patients," "AE's were mostly mild to moderate in intensity," "Majority of AE's not considered by investigators to be study drug related," "2 SAE's reported during follow-up period," and "Safe and well tolerated to date."

59.     The above statements identified in emphasis were materially false and misleading. Defendants' statements hid from investors that RG-101 caused jaundice and hyperbilirubinemia in test patients. Defendants knew that RG-101 was unsafe but misled investors by indicating that RG-101 had been "well tolerated with the majority of adverse events considered mild or moderate."

60.    The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in higher levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material.

### February 17, 2016 – Conference Call

61.    On February 17, 2016, in connection with the release of the Phase II preliminary results, Regulus, Grint, Huang, and Hagan held a conference call to discuss the results. In response to an analyst question regarding the reported SAEs and "whether they were deemed drug-related" or if the liver was involved, Michael Huang, Regulus' VP of clinical development stated:

**Huang**

The most common events have been fatigue and headache, each reported by about 11% of our patients. A total of five patients or 6% have reported injection site reactions. Two serious adverse events were **reported several weeks after completion** of treatment during the follow-up period. Both of these patients were treated in the hospital, released and are currently doing well and continuing to participate in the study. Finally, it is important to note that there have been no study discontinuations to date.

\*    \*    \*

Overall, we continue to be very pleased with the safety profile of RG-101 in hep-C patients and we look forward to growing the safety database with larger patient numbers in future clinical studies. So with that, I will turn it over to Jay.

\*    \*    \*

So **one of the SAEs was deemed to be possibly related by the investigator**. The other event was considered not related. And so, again, I think these are events that occurred several weeks after dosing. All of these patients, as you know, **in addition to their chronic hepatitis C had other medical issues as well**, so I think that's kind of where we're at at this point in time.

\*    \*    \*

Overall so far the safety profile has been very good. What's important, I think, from, obviously, this study we're reporting today is not just the tremendous efficacy results, **but it's also the safety here.** As Mike

16

highlighted on the slides, we've seen very little in terms of adverse events. Most of them are mild to moderate, which is good. Very little in terms of injection site reactions, and **the two serious adverse events that we've seen are not concerning to us.**

Just to remind you, we're in a chronic hep-C patient population. **There's multiple other comorbidities as you follow a set of patients like this over a prolonged period of time, you are going to get serious adverse events reported by definition** and the same is true that we've seen for all the oral DAAs as well.

*    *    *

**Jim Birchenough** - Wells Fargo Securities - Analyst
Congrats on the results. Great to see. A couple questions. First, just on the two SAEs, could you maybe just go into a bit more detail on what was seen there and **what gives you confidence it wasn't drug-related**? And then on the one patient that didn't get a sustained response in terms of undetectable virus, was there any sign of resistance mutation or any further detail to help understand that patient. That would be helpful. And then I've got a follow-up.

**Grint**
Good questions. Let me hand over to Mike to address those.

**Huang**
So first of all, with regard to the serious adverse events, so I think it's always difficult to tease out exactly what is the exact etiology of these events. But, as we mentioned, **both of these events occurred several weeks after dosing. These patients had a number of other co-morbidities and in both instances**, the patients did well after a brief hospitalization. They were treated, they improved. They are still active in the study. What we plan to do is present a little bit more detail, a little bit more information on these cases, probably at a future medical conference. But I think suffice to say both patients are doing well and responding and we're pleased with their progress.

62.    The above statements were materially false because Defendants knew that the hyperbilirubinemia SAE being referred to was in fact related to RG-101. Investors and analyst read this comment to mean that although the SAE was deemed to be "possibly" related to the drug, it was unlikely, due to the fact that the event

17

"occurred several weeks after dosing" and the patients "had other medical issues as well." The analyst question of "what gives you confidence [the SAE] wasn't drug-related?" shows how investors and analyst were misled. In fact, the hyperbilirubinemia was drug related and Defendants had a report from their investigator saying as much. Defendants downplay of the cause of hyperbilirubinemia misled investors as to the safety of RG-101.

63. This was material because the safety of RG-101 was essential to its success. Had investors been told that RG-101 was in fact the underlying cause of hyperbilirubinemia, investors could have assessed the risks of RG-101 and Regulus.

### *February 22, 2016 – Press Release*

64. On February 22, 2016, Regulus issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing Regulus' financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2015. The press release stated in relevant part:

> LA JOLLA, Calif., February 22, 2016 – Regulus Therapeutics Inc. (NASDAQ:RGLS), a biopharmaceutical company leading the discovery and development of innovative medicines targeting microRNAs, today reported financial results for the fourth quarter and full-year ended December 31, 2015 and provided a summary of recent corporate highlights.
>
> "2015 was a milestone year for the company with the filing of three investigational new drug applications in the United States, and two clinical trial applications in the European Union," said Paul Grint, M.D., President and CEO of Regulus. "Our priorities for 2016, based on the data seen to date, include acceleration of our clinical programs, advancing our pipeline and defining the regulatory path to approval for our lead programs."
>
> *      *      *
>
> **Recent Highlights**
>
> RG-101 (GalNAc-conjugated anti-miR122 for the treatment of Hepatitis C Virus)

• **Interim Results from Phase II Combination Study**. Regulus recently announced interim results from one of the company's ongoing Phase II studies of RG-101 for the treatment of Hepatitis C Virus infection (HCV). The study was designed to evaluate a shortened, four-week treatment regimen containing a subcutaneous administration of 2 mg/kg of RG-101 at Day 1 and Day 29, in combination with 4 weeks of once/daily approved anti-viral agents Harvoni®, Olysio®, or Daklinza™. The study enrolled 79 treatment naïve genotype 1 and 4 HCV patients (Harvoni® arm, n=27, Olysio® arm, n=27, Daklinza™ arm, n=25). Thirty-eight patients have been evaluated through 8 weeks of follow up. Ninety-seven percent of those patients (37/38) had HCV RNA viral load measurements below the limit of quantification. ***To date, RG-101 has been generally well tolerated with the majority of adverse events considered mild or moderate, and with no study discontinuations.*** For those patients through 12 weeks of follow-up, 100% remained below the limit of quantification (14/14). The primary endpoint analysis (12 week follow up) for all 79 patients in the study are anticipated to be reported in late Q2 2016.

*      *      *

• Enrollment Nearly Complete in US Phase I Study. Enrollment is nearly complete in a multi-center, open label, non-randomized Phase I study to compare the safety, tolerability, pharmacokinetics, and pharmacodynamics of RG-101 in subjects with severe renal insufficiency or end-stage renal disease ("ESRD") to healthy control subjects, and further explore RG-101 in hepatitis C infected subjects with severe renal insufficiency or ESRD. Regulus anticipates reporting safety and efficacy data from the HCV/severe renal impairment or ESRD arm in the second half of 2016.

Emphasis added.

65.     The above statements identified in emphasis were materially false and misleading. Defendants' statements hid from investors that RG-101 caused jaundice and hyperbilirubinemia in test patients. Defendants knew that RG-101 was unsafe but misled investors by indicating that RG-101 had been "well tolerated with the majority of adverse events considered mild or moderate."

66.     The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in higher levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material.

<u>*February 22, 2016 – Earnings Call*</u>

67.     On February 22, 2016, Regulus held an earnings call to go over the 2015 Form 10-K results. On the call Grint discussed the safety of RG-101. Grint stated in pertinent part:

**Grint**

To date, RG-101 has demonstrated potent and sustained responses in a wide range of HCV patients, genotypes 1, 3 and 4; those with varying liver fibrosis scores of baseline; treatment-naive and those patients who have failed a prior interferon-containing regimen. **RG-101 has demonstrated the ability to be safely combined with all classes of direct-acting antivirals as represented by the drugs used in the current Phase II study**, Harvoni, Olysio and Daklinza, nucleoside, non-nucleoside, polymerase inhibitor, and an NS5A.

\*     \*     \*

Okay, Bill. This is Paul. So let me just summarize with regard to the SAEs and thanks for the question. We did report the two SAEs in the call last week. But from what we've seen so far, **we're certainly not worried about the safety profile of RG-101 or in fact the reported SAEs**. As we mentioned last week, both of these occurred in the treatment follow-up period, both these patients received treatment and neither patient discontinued from the study.

\*     \*     \*

So what we talked about is obviously for appropriate balance, we report a summary of the safety and the efficacy, and we had two serious adverse events. And I think people need to understand that's a regulatory definition term. Basically adverse events are graded and these two met the grade to be called serious under a regulatory definition. **Just to remind you, these are patients that have chronic hepatitis C, they have multiple other co-morbid conditions, and we're following them for very prolonged periods of time, and we'd expect to see other things reported over a follow-up period.**

68.     The above statements were materially false because Defendants knew that the hyperbilirubinemia SAE being referred to was in fact related to RG-101. Investors and analyst read this comment to mean that although the SAE was deemed to be "possibly" related to the drug, it was unlikely. Defendants downplaying of the cause of the SAE misled investors as to the safety of RG-101.

69.     This was material because the safety of RG-101 was essential to its success. Had investors been told that RG-101 was in fact the underlying cause of hyperbilirubinemia, investors could have assessed the risks of RG-101 and Regulus.

### *February 23, 2016 – Form 10-K*

70.     On February 23, 2016, Regulus filed a Form 10-K with the SEC announcing Regulus' financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2015 ("FY 2015 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by Grint and Hagan.

71.     In the FY 2015 10-K Regulus reaffirmed the statements in the corresponding press release. More specifically, Regulus stated: "***[t]o date, RG-101 has been generally well tolerated with the majority of adverse events considered mild or moderate (headache and fatigue most commonly reported, each at approximately 11%), two SAEs reported during the follow-up period, and with no study discontinuations.***"

72.     The above statements identified in emphasis were materially false and misleading. Defendants' statements misled investors into believing that RG-101 was generally safe and that FDA approval would be forthcoming. Defendants knew that RG-101 was unsafe but misled investors by indicating that RG-101 had been "well tolerated with the majority of adverse events considered mild or moderate."

73.     The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in high levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material.

*April 15, 2016 – Press Release*

74.    On April 15, 2016, Regulus issued a press release announcing interim data on RG-101 presented at the International Liver Congress. The press release stated in relevant part:

> LA JOLLA, Calif., April 15, 2016 /PRNewswire/ -- Regulus Therapeutics Inc. (NASDAQ:RGLS), a biopharmaceutical company leading the discovery and development of innovative medicines targeting microRNAs, today announced additional interim results from one of the company's ongoing Phase II studies of RG-101 for the treatment of Hepatitis C Virus infection (HCV) during an oral presentation at the International Liver Congress 2016 (ILC 2016) taking place April 13-17 in Barcelona, Spain. The study was designed to evaluate a shortened, four-week treatment regimen containing a subcutaneous administration of 2 mg/kg of RG-101 at Day 1 and Day 29, in combination with 4 weeks of once/daily approved anti-viral agents Harvoni®, Olysio®, or Daklinza™. The study enrolled 79 treatment naïve genotype 1 and 4 HCV patients (Harvoni® arm, n=27, Olysio® arm, n=27, Daklinza™ arm, n=25).
>
> *                *                *
>
> "We believe the data reported at the ILC meeting further demonstrate the clinical utility of RG-101 to shorten oral HCV treatment regimens to just four weeks," said Paul Grint, M.D., President and CEO of Regulus. "With interim data now through 24 weeks of follow-up, *the consistent trend in efficacy and safety is encouraging, which supports the potential of RG-101 to become a backbone agent in combination with all classes of oral therapies.* Throughout the year, we look forward to obtaining more data from multiple studies across our broad Phase 2 development program."
>
> *To date, RG-101 has been generally well tolerated with the majority of adverse events considered mild or moderate, and with no study discontinuations.* Changes in pharmacodynamic markers are indicative of effective target engagement and consistent with the company's prior experience with miR-122 inhibition. The primary endpoint analysis (12 week follow up) for all 79 patients in the study is anticipated to be reported in late Q2 2016.

Emphasis added.

75.     The statements above were false and/or misleading as well as failed to disclose material adverse facts about RG-101. Specifically, these statements were false and/or misleading statements and/or failed to disclose that RG-101 was in fact a safety concern because it was the underlying cause of hyperbilirubinemia. Defendants had a report that indicated that RG-101 was "probably" the cause of the first reported case of jaundice. However, Defendants ignored their investigators report and continued to mislead investors as to the safety of RG-101. By doing so, investors assumed that the drug was safe and would soon receive FDA approval. In fact, RG-101 was so dangerous that FDA would issue a clinical hold on all testing based on pre-clinical information already in Defendants' possession.

76.     This was material because the safety of RG-101 was essential to Regulus' success. Had investors been told that RG-101 was in fact the underlying cause of hyperbilirubinemia, investors could have assessed the risks of RG-101 and Regulus.

### *April 15, 2016 – Conference Call*

77.     On April 15, 2016, Regulus hosted a webcast and conference call to present additional interim data on RG-101 at the International Liver Conference. Grint and Hogan stated in pertinent part:

**Grint**

Slide 14 we summarize safety findings and we are pleased with the consistent safety profile of RG-101. Multiple injections of RG-101 in combination with oral agents have been well-tolerated. Most adverse events have been mild to moderate in nature. The common events have been fatigue and headache, each reported by approximately 16% and 13% of patients respectively. There have been no study discontinuations to date.

As you can see on the next slide, slide 15, two serious adverse events have been reported which we discussed in our last call. These two SAEs have been reported several weeks after completion of treatment

during the follow-up period. Today we have more information to share on these two events.

The first reported SAE was a transient episode of dyspnea that occurred in a 54-year-old male more than two months after completion of therapy in the Olysio combination arm. Investigators have determined that this was not related to study drug. He was admitted to the hospital overnight, received treatment, and was discharged from hospital the next day.

The second serious adverse event was an event of jaundice in the Daklinza arm. This was a 56-year-old male who was admitted to hospital for the management of jaundice 21 days after completion of therapy. In addition to his chronic HCV infection, he had a history of poorly controlled diabetes and alcohol use.

The elevated bilirubin was associated with jaundice with minimal changes in transaminases. Ultrasound imaging indicated potential sludge and debris in the biliary tract and gallbladder thickening. Investigation is currently ongoing to further determine etiology. The patient has been empirically treated with antibiotics and corticosteroids and is recovering and remains active in the study.

**Hagan**

Additionally, treatment with RG-101 **has shown an encouraging and consistent safety profile in clinical studies to date**. The product profile continues to mature and we believe that RG-101 may play an important role in advancing the current field of hepatitis C treatment options.

78.   In support of the webcast/call, Regulus also prepared a slide presentation entitled "ILC 2016: RG-101 Phase II Results Webcast & Conference Call." On slide 14, entitled "Summary of Adverse Events (AEs)," Regulus disclosed in a footnote that the Daklinza arm of the RG-101 Phase II trial had a severe adverse event from jaundice. Regulus elaborated on slide 15 stating in pertinent part:

Jaundice (Daklinza arm) – ***Possibly related to Study Drug***

- 56-year old male presented with jaundice, fatigue, abdominal pain, and nausea 21 days after completion of therapy. Clinical chemistry showed significantly elevated total and direct bilirubin with minimal changes in transaminases. Ultrasound indicated potential sludge/debris in biliary tract and gallbladder wall thickening. Additional medical history included diabetes (not well-controlled) and alcohol use. Work-up ongoing to determine etiology. Patient currently recovering and remains active in study with favorable virologic response.

79.   The statements above were false and/or misleading as well as failed to disclose material adverse facts about RG-101. Specifically, these statements were false and/or misleading statements and/or failed to disclose that RG-101 was in fact a safety concern because it was the underlying cause of hyperbilirubinemia. Defendants had a report that indicated that RG-101 was "probably" the cause of the first reported case of jaundice. However, Defendants ignored their investigators report and continued to mislead investors as to the safety of RG-101. By doing so, investors assumed that the drug was safe and would soon receive FDA approval. In fact, RG-101 was so dangerous that FDA would issue a clinical hold on all testing based on pre-clinical information already in Defendants' possession.

80.   This was material because the safety of RG-101 was essential to its success. Had investors been told that RG-101 was in fact the underlying cause of hyperbilirubinemia, investors could have assessed the risks of RG-101 and Regulus.

### *May 2, 2016 – Press Release*

81.   On May 2, 2016, Regulus issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC announcing Regulus' financial and operating results for the first quarter ended March 31, 2016. The press release stated in relevant part:

LA JOLLA, Calif., May 2, 2016 /PRNewswire/ — Regulus Therapeutics Inc. (NASDAQ: RGLS), a biopharmaceutical company leading the discovery and development of innovative medicines targeting microRNAs, today reported financial results for the first

25

quarter ended March 31, 2016 and provided a summary of recent corporate highlights.

"2016 is shaping up to be a pivotal year of growth for Regulus. Our progress in the first quarter has continued to demonstrate our ability to advance multiple clinical programs and execute well on our stated goals," said Paul Grint, M.D., President and CEO of Regulus. "RG-101, with curative potential for hepatitis C viral infection, remains our primary focus and we are very gratified with the efficacy and safety reported thus far. The unique mechanism of action for RG-101, targeting a human factor necessary for viral replication within the liver, supports the potential of RG-101 to become a backbone agent for combinations with all classes of direct anti-HCV therapies. In the coming quarters, we look forward to accelerating our broad Phase II development program and reporting additional data that will help define the regulatory pathway for potential approval." […]

**Recent Highlights**

RG-101 (GalNAc-conjugated anti-miR122 for the treatment of Hepatitis C Virus)

•      Reported Interim Results at ILC 2016. At the International Liver Congress Meeting (ILC 2016), Regulus announced interim results during an oral presentation in the general session from one of the company's ongoing Phase II studies of RG-101 for the treatment of HCV. The study was designed to evaluate a shortened, four-week treatment regimen containing a subcutaneous administration of 2 mg/kg of RG-101 at Day 1 and Day 29, in combination with 4 weeks of once/daily approved anti-viral agents Harvoni®, Olysio®, or Daklinza™. The study enrolled 79 treatment naïve genotype 1 and 4 HCV patients (Harvoni® arm, n=27, Olysio® arm, n=27, Daklinza™ arm, n=25). Available data from 64 patients at the interim analysis demonstrated high virologic response rates in all treatment groups, providing further evidence of RG-101's potential to successfully shorten the duration of oral regimens. **To date, RG-101 has been generally well tolerated with the majority of adverse events considered mild or moderate**, and with no study discontinuations. The primary endpoint analysis (12 week follow up) for all 79 patients in the study are anticipated to be reported in late Q2 2016.

*      *      *

•      **Enrollment Initiated in US Phase I Study.** Today, Regulus announced that enrollment is near completion in a multi-center, open

26

label, non-randomized Phase I study to compare the safety, tolerability, pharmacokinetics, and pharmacodynamics of RG-101 in subjects with severe renal insufficiency or end-stage renal disease ("ESRD") to healthy control subjects, and further explore RG-101 in hepatitis C infected subjects with severe renal insufficiency or ESRD. Regulus anticipates reporting safety and efficacy data from the HCV/severe renal impairment or ESRD arm in the second half of 2016.

Emphasis added.

82.     The above statements identified in emphasis were materially false and misleading. Defendants' statements hid from investors that RG-101 caused jaundice and hyperbilirubinemia in test patients. Defendants knew that RG-101 was unsafe but misled investors by indicating that RG-101 had been "well tolerated with the majority of adverse events considered mild or moderate."

83.     The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in higher levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material.

### *May 2, 2016 – Earnings Call*

84.     On May 2, 2016, Regulus held an earnings call to go over the 2016 first quarter results. On the call Grint and Huang discussed the safety of RG-101. Grint stated in pertinent part:

**Grint**

Based on the consistency of the response rates **and the favorable safety profile to date**, we have accelerated developments of the clinical program and CMC readiness and the actively designing additional combination studies to help us further understand the potential for the product and define the optimal path for regulatory approval.

\*          \*          \*

So to close by introductory remarks, I'd like to summarize our goals for the current year. RG-101 remains our main focus. We've

27

accelerated development with the initiation of key clinical trials in both Europe and the United States. We expect to report additional combination data from multiple trials and we expect to obtain clarity on a potential path for approval.

**Huang**

We're very encouraged with the results of RG-101 thus far. Our clinical experience to date has demonstrated potent anti-viral activity both as monotherapy as well as in combination with oral DAAs and a shortened four week regimen across different oral mechanisms. **To date RG-101 has been well tolerated with nearly all adverse events considered mild or moderate and with no adverse events leading to discontinuation in any study.**

85.    In response to analyst questions regarding the SAEs, Grint stated the following:

**Madhu Kumar**

Hey guys. My questions is about the patient who had a serious adverse event related to elevated bilirubin, will there be -- do you have any additional color on that now or will additional color on that come out with the next data release?

**Grint**

Yeah, we'll talk -- that was nicely summarized during the usual presentation, what the information we had and if you basically what was reported was the patient was recovering the total bilirubin was decreasing over time, but yes obviously we continue to get follow-up information from this patient and we will report further information on this individual when we have data overall 12 week primary endpoint data.

86.    The above statements identified in emphasis were materially false and misleading. Defendants' statements hid from investors that RG-101 had a propensity to caused jaundice and hyperbilirubinemia in test patients. Defendants knew that RG-101 was unsafe but misled investors by indicating that RG-101 had been "well tolerated with the majority of adverse events considered mild or moderate."

28

87.     The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in higher levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material.

### *May 2, 2016 – Form 10-Q*

88.     On May 2, 2016, after hours Regulus filed a Form 10-Q with the SEC announcing Regulus' financial and operating results for the first fiscal quarter ended March 31, 2016 ("1Q2016 10-Q"), which was signed and certified under the Sarbanes Oxley Act of 2002 by Grint and Hagan.   The 2Q2016 10-Q stated in relevant part:

> To date, **RG-101 has been generally well tolerated** with the majority of adverse events considered mild or moderate, and with no study discontinuations. The primary endpoint analysis (12 week follow up) for all 79 patients in the study are anticipated to be reported in late Q2 2016.

89.     The above statements identified in emphasis were materially false and misleading. Defendants' statements hid from investors that RG-101 had a propensity to cause jaundice and hyperbilirubinemia in test patients. Defendants knew that RG-101 was unsafe but misled investors by indicating that RG-101 had been "well tolerated with the majority of adverse events considered mild or moderate."

90.     The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in higher levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material.

### E. The Truth Begins to Emerge Through Partial Corrective Disclosures

### *June 27, 2016 – Press Release*

91.     On June 27, 2016, Regulus issued a press release and filed a Form 8-K with the SEC announcing that Regulus had received verbal notice from the FDA that Regulus' IND for RG-101 for the treatment of chronic hepatitis C virus infection

had been placed on full clinical hold after a second serious adverse event of jaundice was reported. The press release stated in relevant part:

> LA JOLLA, Calif., June 27, 2016 /PRNewswire/ -- Regulus Therapeutics Inc. (Nasdaq: RGLS), a biopharmaceutical company leading the discovery and development of innovative medicines targeting microRNAs, today announced it ***received verbal notice from the U.S. Food and Drug Administration (FDA) that its Investigational New Drug (IND) for RG-101 for the treatment of chronic hepatitis C virus (HCV) infection has been placed on clinical hold***. Regulus anticipates it will receive a formal clinical hold letter from the FDA within 30 days and plans to work diligently with the agency to seek the release of the clinical hold.
>
> ***The FDA initiated the clinical hold after Regulus reported a second serious adverse event (SAE) of jaundice***. The SAE occurred in a HCV patient with end-stage renal disease on dialysis enrolled in its on-going Phase I US study 117 days after receiving a single dose of RG-101.
>
> ***Timelines for Regulus' three on-going studies of RG-101 are not expected to be impacted as all patients have been enrolled and completed their dosing of RG-101 and will continue with protocol scheduled visits***. Regulus remains on track to deliver follow-up results from these studies at upcoming relevant scientific meetings.

(Emphasis added.)

92.    For the first time, this information revealed to the market that RG-101 was generally unsafe. The FDA only issues a clinical hold in cases where "patients are exposed to immediate and serious risk."

93.    On the release of the news, Regulus' share price declined from $5.01 per share of stock on June 27, 2016, to close at $2.54 per share on June 28, 2016, a drop of approximately 49.3%.

94.    Despite the FDA clinical hold, Defendants would continue to mislead investors.

## June 27, 2016 – Conference Call

95.    On June 27, 2016, Regulus held a conference call in connection with the Press Release announcing the FDA hold. In Grint's prepared remarks, Grint stated in pertinent part:

**Grint**

Thank you, Allison. Late last week we received verbal notice from the FDA that our IND for RG-101 has been placed on clinical hold following our submission of a new serious adverse events, SAE, of jaundice in an HCV patient with end-stage renal disease on dialysis in our ongoing Phase 1 US study. The FDA noted that we had reported one previous serious adverse event of jaundice earlier in the year from our Phase 2 sandwich DAA combination study. It's our understanding that given that the mechanism for these two events appears uncertain at this time, the FDA considers it appropriate to issue a clinical hold.

The first serious adverse event of jaundice has been described on conference calls earlier this year and the details of which were presented at EASL 2016 in April. That patient was treated in our Phase 2 close-faced sandwich study with one dose of RG-101 on day one, four consecutive weeks of the oral DAA Daklinza, and then a second dose of RG-101 on day 29.

**In addition to chronic hepatitis C, the patient had poorly controlled diabetes, requiring insulin therapy, and a history of alcohol abuse.** The patient has since recovered and is continuing to participate in this trial and is now over six months out following completion of HCV therapy with a viral load below the limit of quantification.

**This second serious adverse event of jaundice occurred 117 days after receiving a single dose of RG-101 in our Phase 1 US IND study in an HCV patient who also had end-stage renal disease requiring dialysis. In addition to his renal insufficiency and HCV infection, this patient also had poorly controlled type II diabetes requiring insulin therapy, coronary artery disease with prior open-heart surgery, high cholesterol, high blood pressure, and recent herpes zoster infection requiring the oral antiviral, Acyclovir. The patient is on over a dozen concomitant**

**medications, including blood pressure medications, statin therapy, and insulin.**

The laboratory results revealed marked elevation in total bilirubin and the patient was admitted to the hospital for further evaluation including ultrasound, CT, magnetic resonance cholangiopancreatography, or MRCP, and additional lab workup. The ultrasound revealed mild ascites, cholelithiasis, and gallbladder wall thickening without dilutation of the biliary tree. The CT scan of the abdomen showed fatty liver and fluid around the gallbladder. The MRCP scan revealed an enlarged liver and ascites, but no biliary tree or pancreatic duct dilutation.

A viral hepatitis panel was negative for acute or active hepatitis A or B and HCV RNA remained below the lower limit of quantification. Total bilirubin remained stable during hospitalization. The patient has since been discharged in stable condition. The investigator assessed the event as unlikely to be related to RG-101. We are continuing to follow up on his status at this time.

It's worth noting that to date we've dosed just over 200 subjects and we experienced two serious adverse events of jaundice, which equates to an event rate of 1%. **In reviewing the literature on other recent HCV programs, including marketed DAAs, we note that the rate of clinically significant changes in bilirubin in our program are consistent with what has been seen in other programs in the population of patients with significant liver disease.**

Of course, patient safety is our top priority and we are working closely with the FDA to promptly address any and all issues. We expect to receive written communication from the FDA within the next 30 days that will provide the necessary details as to how to address the clinical hold. Obviously, we're disappointed with these events as we have not seen any bilirubin increases in any of our nonclinical studies across four different species.

96.     In the question and answer portion of the conference call, Grint responded to analyst questions concerning the second reported case of jaundice. Grint stated in pertinent part:

**Grint**

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 3:17-cv-00182- BTM-RBB

Matthew, let me please, importantly, firstly correct you. No, these are not Hy's Laws cases, either of them. We're talking about significant bilirubin increases, but they do not meet Hy's Laws, because you are not seeing increases in the other enzymes that would meet that diagnosis.

Just to remind you, the FDA, as all drug developers are, are obviously concerned about drug-induced liver injury. The FDA has a guidance that's out. They go on alert in essence; we do with one patient who has significant Grade 3 or Grade 4 events.

This is the second patient, and so the way we look at this is this is the FDA following what they believe is their appropriate practice, which is to currently put us on hold. Although, as I indicated earlier, we're not actually dosing anymore RG-101 patients now, so it's not as if we're stopping any protocols with respect to dosing.

Clearly, we need to wait for the letter to see what their questions are. We have, as I think you're aware from what we've previously discussed, detailed follow-up periods over a 48-week period after the conclusion of dosing in all our ongoing studies, and we will continue to follow these patients out to monitor them. As indicated in this second patient, **we're talking about 117 days after a single dose of RG-101, so quite a long time of follow-up.**

\*       \*       \*

The only thing I just want to point out is -- of interest, as we only have two cases, but if one looks for common themes **both these patients had long-standing type II diabetes. They were both poorly-controlled diabetics, on insulin, with a number of other underlying medical conditions. In fact, the reason for the dialysis of the second patient is because basically they had diabetic nephropathy that had progressed to end-stage renal disease**.

\*       \*       \*

**Eric Schmidt** - Cowen and Company - Analyst
And when you gave the background incidents of increases in bilirubin being above 1%, do you have an estimate of the background incidents of an SAE related to elevation in bilirubin?

**Grint**
So let's just clarify. SAE is a regulatory term, so if this patient had not been admitted to hospital but had an increased bilirubin then, in fact,

33

they wouldn't have been a serious adverse event, but they would have been a severe adverse event based on the magnitude of the change in bilirubin. So I think probably the better way to look at this, which is what we've done, is to look at background event rates of Grade 3 and Grade 4 bilirubin. In essence, we're looking at significant increases in previous studies.

\*       \*       \*

Well, just to remind you, we have actually an extensive nonclinical program on RG-101, including dosing in nonhuman primates; four doses given over a period of 12 weeks at very significant multiples above where we are in the clinic. And **in all our nonclinical studies we haven't seen any hint of bilirubin elevation**.

And so I think at this point I don't want to speculate about whether or not RG-101 is associated with this or not, or how we might follow it up. Clearly, we are waiting for the FDA letter and then, absolutely, our goal is to answer their questions as rapidly and as completely as we can.

\*       \*       \*

**Eric Schmidt** - Cowen and Company - Analyst
Okay. Maybe just a, I don't know, wacky question so please excuse me, but have any of the preclinical studies on other microRNA targets uncovered anything of bilirubin or liver toxicity source?

**Grint**
Actually, not a wacky question, Eric. I think a very good question and the simple answer is no. Bilirubin is not something that we've seen.

What you do see, and we've reported for RG-101 -- and this is fairly true, I think, for a number of oligonucleotides -- is at very high doses you do get some increases in transaminases that seem to be self-limiting, because they will actually increase a bit and then stay or even decrease during continued dosing, which is defined as being part of a oligo-associated toxicity. So it's not sequence or target specific. I think it seems to – the agreement is that it's associated, frankly, with just very significant amounts of oligonucleotides that we're giving to animal toxicology species at multiple-fold above what we give in the clinic.

So long answer, but the answer to your question is in our other programs **currently we haven't seen any bilirubin increases in our**

34

**chronic tox studies**. And we do have some pretty significant experience. With our RG-012 program, we've gone through significant chronic toxicity, animal studies, that allow us to dose for a year or more in the clinic.

*     *     *

**Unidentified Participant**
Good afternoon. It's Nick in for Jim this afternoon. Thanks for taking our question. Can I just start -- did either of these patients have a history of jaundice?

**Grint**
Not that we're aware of; not that I'm aware of. I think that was questioned as part of the follow-up, but not that we're aware of. But I will say that their gallbladders, **both of them their gallbladders on ultrasound imaging were not normal, if you see what I mean?**

97.    Despite the FDA's clinical hold, Regulus continued to downplay the jaundice and attribute the findings to factors other than RG-101. For example, Regulus told investors that the investigator found the hyperbilirubinemia "as unlikely to be related to RG-101" and provided a range of other factors as evidence that RG-101 was safe and did not contribute to the hyperbilirubinemia.

98.    In reality, RG-101 was the underlying cause of hyperbilirubinemia. Defendants at this time had at least one report indicating as much. Further, Defendants had pre-clinical studies that would ultimately be used to determine that RG-101 was the mechanism for the hyperbilirubinemia. However, despite having this information, Defendants still misled investors as to the safety and viability of the drug.

99.    The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in higher levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material.

<u><em>July 27, 2016 – Press Release</em></u>

100.  On July 27, 2016, Regulus issued a press release and filed a Form 8-K with the SEC announcing that Regulus had received written communication from

35

the FDA outlining information required to resolve the clinical hold for its Investigational New Drug (IND) for RG-101. The press release stated in relevant part:

> LA JOLLA, Calif., July 27, 2016 /PRNewswire/ -- Regulus Therapeutics Inc. (Nasdaq: RGLS), a biopharmaceutical company leading the discovery and development of innovative medicines targeting microRNAs, today announced that, as anticipated, it received written communication from the U.S. Food and Drug Administration (FDA) outlining information required to resolve the clinical hold for its Investigational New Drug (IND) for RG-101, which was announced on June 27, 2016.
>
> In the written communication, the FDA requested the following from the company: detailed safety data analysis from preclinical and clinical studies; exploration of potential mechanisms of hepatoxicity in non-clinical models; review and input from independent hepatotoxicity experts; additional PK data from the US Phase 1 study; and a risk/benefit assessment for the proposed therapeutic regimens containing RG-101. The company anticipates submitting the necessary information by early Q4 2016. The FDA will notify Regulus of its decision within 30 days of receipt of the complete response to the issues.
>
> "We are working expeditiously to resolve the issues outlined in the letter and anticipate a decision from the FDA in the fourth quarter," said Paul Grint, M.D., President and Chief Executive Officer of Regulus. "Timelines of on-going studies have not been impacted by the clinical hold, and we remain on track to deliver follow-up results from ongoing RG-101 studies at upcoming relevant scientific meetings later this year."

Emphasis added.

101.   The above information revealed to the market that RG-101 was unsafe and the full extent of the FDA investigation. This was a full clinical hold resulting in additional studies and a risk/benefit assessment.

102.   On the release of the news, Regulus' share price declined from $4.10 per share of stock on July 27, 2016, to close at $3.57 per share on July 28, 2016, a drop of approximately 12.9%.

*August 2, 2016 – Earnings Call*

103.   On August 2, 2016, held an earning call to discuss the 2016 second quarter results ended June 30, 2016. On the call, Grint stated the following:

**Grint**

As you know, last week we received a formal clinical hold letter from the FDA requesting information required to address the clinical hold that we previously announced. The FDA has requested detailed safety data analysis from preclinical and clinical studies, exploration of potential mechanisms of hepatotoxicity in nonclinical models, review and input from independent hepatotoxicity experts, the additional PK data from the U.S. Phase 1 study and the risk benefit assessment for the proposed therapeutic regimens containing RG-101.

Much of what is being asked of us **is information we have or can obtain over the next couple of months.** We anticipate submitting the aforementioned information by early Q4. Once the FDA receives our written response, we will be notified of their decision within 30 days. Our strategy remains unchanged for RG-101. We are interested in developing a safe and effective treatment for HCV that could be administered in four weeks or less.

**Alan Carr - Analyst**

Thanks for taking my questions. A couple of follow-ups on those. One of them, in terms of what the FDA wants, it sounds like obviously no clinical studies, but I guess can you give us a sense of how much might be needed that in terms of preclinical studies, if any? And then also, maybe give you chance to comment on some of the data from the natural history study and how that might have influence protocol design here for the Phase 2? In other words, can you give us an update on what you are thinking about primary endpoints and that sort of things for that?

**Grint**

Yes. Alan, this is Paul. And thanks for your questions. So with regard to the preclinical information, clearly as we talked about before, **we have conducted a significant formal toxicology program with RG-**

101. There is a lot of **information in the IND that exists** and I think to be helpful to the FDA we can take a lot of that information and put into a format that perhaps would be more helpful with regard to answering that question.

Aside from that, there's a lot of other data as one things about, for example, the miR-122 knockout animal and other pharmacologic models on animals, animal work that's been done. So we are in the process of compiling all that data together with in vitro studies that we have done from a transborder standpoint. So we have a lot of information. I think it's really incumbent on us to put it into a logical format to help the FDA with respect to some of the questions they have.

*          *          *

**Jeff Chen - Analyst**

Hi. Thank you for taking my question, maybe one for Paul. In terms of preclinical studies, are there any additional studies that you are planning to conduct to perhaps review some mechanism of actions that the FDA has requested? And also have you talk to hepatotoxicity experts and if you have gotten any kind of feedback and impressions from them? Thanks.

**Grint**

So yes, a good question. So there is a **limited set of studies that we are contemplating conducting on top of, as I said, what we have already done which is a significant program.** And basically let me just take a step back and just remind you what we have seen in the two serious adverse events reported that we have discussed in some detail on previous goals and also at EASL medical meeting. What we are seeing is isolated increases in bilirubin. And this is not seen with concomitant, significant concomitant increases in other liver enzymes.

As we look at the overall pharmacology and toxicology program which we have conducted, we have not seen increases in bilirubin in a number of different animal species or studies that we have conducted. And so right now for us, there is no obvious mechanism that would associate these. We have some ideas and we will continue to pursue those. But as I indicated earlier, we will be putting all the data

38

together in a logical fashion that helps the FDA address some of the questions that they have asked.

104.   This information was materially misleading because it told investors that Regulus already had the information requested by the FDA and based on their findings, RG-101 was not the underlying cause. However, in reality, Regulus used this exact data to determine that RG-101 was the mechanism of hyperbilirubinemia.

105.   The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in higher levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material.

*August 2, 2016 – Form 10-Q*

106.   On August 2, 2016, after hours Regulus filed a Form 10-Q with the SEC announcing Regulus' financial and operating results for the second fiscal quarter ended June 30, 2016 ("2Q2016 10-Q"), which was signed and certified under the Sarbanes Oxley Act of 2002 by Grint and Hagan.  The 2Q2016 10-Q stated in relevant part:

> In June 2016, we received verbal notice from the U.S. Food and Drug Administration, or FDA, that our IND for RG-101 for the treatment of chronic HCV infection has been placed on clinical hold. The FDA initiated the clinical-stage renal disease on dialysis enrolled in our on-going Phase I US study 117 days after receiving a single dose of RG-101. Timelines for our three on-going studies of RG-101 are not expected to be impacted as all patients have been enrolled and completed their dosing of RG-101 and will continue with protocol scheduled visits. In July 2016, we received a formal clinical hold letter from the FDA requesting the following from us: detailed safety data analysis from preclinical and clinical studies; exploration of potential mechanisms of hepatoxicity in non-clinical models; review and input from independent hepatotoxicity experts; additional PK data from the US Phase 1 study; and a risk/benefit assessment for the proposed therapeutic regimen containing RG-101. We anticipate submitting the necessary information by early Q4 2016. The FDA will notify us of its decision within 30 days of receipt of the complete response to the

issues. ***We plan to work diligently with the FDA to seek the release of the clinical hold.***

107.   This information was misleading because Defendants already knew that RG-101 was unsafe and would not be approved by the FDA. This is evident by the information in Defendants possession regarding the underlying studies and the first case of jaundice. However, Defendants made the above misleading statements in an attempt to mislead investors as to the safety and viability of their drug.

108.   This information was material because FDA approval of their primary product was necessary to raise additional funds via debt financing. If the market knew the truth, *i.e.*, that RG-101 would not get FDA approval, they may not have been able to get a $30 million dollar loan.

<u>*November 1, 2016 – Earnings Call*</u>

109.   The next day, Regulus held a conference call with analysts concerning Regulus' third fiscal quarter results. During the call, Defendants Grint and Hagan, and non-party Wright each spoke about Regulus' response to the FDA on its clinical hold of RG-101. In relevant part, the Individual Defendants stated:

**Tim Wright** Regulus Therapeutics Inc. – Chief R&D Officer

Thanks, Paul. Before I go into an RG-101 update, I'd like to share with you my first impressions of Regulus and why I believe it's a great time to be part of this company.

\*      \*      \*

Moving on to the current status of RG-101. The work to address the clinical hold was well underway when I joined the company. Since joining, I assumed leadership for the team responsible for the response to the FDA. As I'm sure you're aware, in late July, Regulus received a formal clinical hold letter from the FDA requesting additional information, which included five items. First, a detailed safety analysis from preclinical and clinical studies; second, exploration of potential mechanisms of hepatotoxicity in nonclinical models; third, review and input from independent hepatotoxicity experts; fourth, additional pharmacokinetic data from the U.S. Phase 1 study; and fifth, a risk-benefit assessment for the proposed therapeutic regimens containing RG-101.

Since the receipt of the letter detailing the request for additional data and analysis, we had initiated additional mechanistic work, the data of which we now believe will enhance the package we plan to submit. Furthermore, we've been formulating a plan that may provide a path forward. Based on the timing of the results of these additional studies, which we intend to include in our response, we've pushed out our resubmission time line several weeks and, thus, would now expect a response from the agency in the first quarter of 2017. Our goal is to get off clinical hold and initiate additional planned studies, including the single-visit cure regimen in collaboration with GSK and, ultimately, to partner the program.

While we are in the midst of the clinical hold, we have decided to focus our resources on addressing the issues outlined by the agency, completing the additional studies I mentioned and assembling this comprehensive package for the FDA response. We are not planning any further interim data cuts on our ongoing RG-101 studies. We do, however, continue to collect safety data on all active clinical trials, and we'll update our safety database accordingly. We do not plan further evaluation of the efficacy data until the hold is resolved.

Now stepping back and reiterating why I decided to join Regulus at this time. It's clear that Regulus is at the forefront of developing truly novel therapeutics that can broadly address disease pathways. We look forward to sharing more with you at the upcoming R&D Day on December 6, when we plan to announce our next clinical candidate.

*     *     *

**Paul Grint** Regulus Therapeutics Inc. – President and CEO

Thank you, Jay. I hope you found this update on our clinical portfolio helpful. Our time lines on providing the RG-101 response to the FDA has moved out a couple of months due to our decision to generate and include additional results. ***We feel more confident now, based on what we've learned over the last several months, that this comprehensive submission could provide a path forward for the program*** and look forward to the FDA feedback in the first quarter next year.

*     *     *

**Liana Moussatos** Wedbush Securities Inc. – Analyst

CONSOLIDATED CLASS ACTION COMPLAINT<br>Master File No. 3:17-cv-00182- BTM-RBB

Just following up, to be clear, what is left that you need to do in order to submit the package to the FDA to get RG-101 off clinical hold? And how long do each of these items take? Is there only eight weeks left?

**Tim Wright** Regulus Therapeutics Inc. – Chief R&D Officer

I'm sorry, we missed the end of your --

**Paul Grint** Regulus Therapeutics Inc. – President and CEO

If there's only eight weeks left.

**Tim Wright** Regulus Therapeutics Inc. – Chief R&D Officer

Are there only eight weeks left? Well, what I can tell you is that many of these studies started before I joined, which was four weeks ago. And so there are some studies that we'll take a few more weeks to complete. And then as Paul mentioned, we have the report writing and the compiling and then the overarching work that needs to be feeding back in each of these five items.

Suffice it to say that the -- some of the items were relatively easy to address and compile the data, such as the existing safety database, although we're updating that in real time, and we'll do so after the submission. But other items, in particular, some of the in vivo work that had to be done, that we felt was important to do, will take a few more weeks for the in live portion, and then we have the analysis.

So that's -- that gives you as much detail as we're willing to share at this time, but we anticipate, like I said, having this done in several weeks and expect the response in Q1.

Emphasis added.

110.   This information was materially misleading because it told investors that Regulus already had the information requested by the FDA and based on their findings, the FDA would still grant approval. However, in reality, Regulus used this exact data to determine that RG-101 was the mechanism of hyperbilirubinemia, and as a result would discontinue the drug.

111.   The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in higher levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material.

### *November 1, 2016 – Form 10-Q*

112.   On November 1, 2016, after hours, Regulus filed a Form 10-Q with the SEC announcing Regulus' financial and operating results for the third fiscal quarter ended September 30, 2016, which was signed and certified under the Sarbanes Oxley Act of 2002 by Grint and Hagan. The Form 10-Q stated in pertinent part:

> The results from this interim analysis demonstrated significant virologic response through 24 weeks of follow-up. RG-101 plus Harvoni continued to demonstrate 100% response rates. As previously reported, the combination of RG-101 plus either Olysio or Daklinza monotherapies have seen small numbers of viral relapse. The results reported include four new relapses: two in the Olysio arm (weeks 20 and 32) and two in the Daklinza arm (weeks 12 and 24). RG-101 in combination with four weeks of oral DAA therapy **has been generally well tolerated with the majority of adverse events considered mild or moderate**, and with no study discontinuations. Commonly reported adverse events, or AEs, included fatigue, headache, and injection site reactions. In addition, three out of 79 patients had experienced severe adverse events, or SAEs, as of the time of this analysis in June 2016.

113.   The above statements identified in emphasis were materially false and misleading. Defendants knew that RG-101 was unsafe but misled investors by indicating that RG-101 had been "well tolerated with the majority of adverse events considered mild or moderate."

114.   The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in higher levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material

### *December 6, 2016 – Conference Call*

43

115.   On December 6, 2016 Regulus held its R&D Day.  As part of this day, Regulus held a corporate analyst meeting where Defendant Grint made the following statements concerning Regulus' progress and expectations for resolving the RG-101 clinical hold:

**Paul Grint** Regulus Therapeutics Inc – President, CEO

Thank you very much, Jay. Well, we'd like to thank you all for your attention today. We really appreciate everyone being here all listening in.

We've had the opportunity for the first time to obviously showcase some of our very bright and smart scientists within the company together with, I think, giving you a good insight, and to some of the collaborations that we have where they can actually take us from a portfolio standpoint.

I was going to briefly talk about key program events anticipated really over the next six quarters. Today, we haven't talked about RG-101 but I just want to spend a couple of minutes talking about it for you.

Just to remind you, this program was moving well. We did see [2] serious adverse events of hyperbilirubinemia or jaundice and we've put on clinical hold by the FDA back in June of this year.

As we've guided, we've been actively working on the responses to the FDA. The FDA asked us a number of questions, all of which we believe we could address. We guided that basically, we were going to submit the response around yearend back to the FDA. We are on track for that and you can see that we're looking for obviously a response back from the FDA in the first quarter of next year.

We've undertaken a lot of additional work that *we believe that we have a good idea of how 101 maybe associated with some of the impacts that we see in patients and we believe that we have a good part [sic] forward and that's basically what we're going to be submitting to the FDA*.

Clearly, not knowing whether or not we're going to be off hold then we won't going to talk a lot in principle about where we would take the program in the future. But obviously, we're excited hopefully to submit

the package, enter in dialogue with the FDA *and be able to restart the clinical program and clearly, we'll announce that and give you guidance with regard to what we're doing clinically if that's the case in the early part of next year.*

\*          \*          \*

**Alan Carr** Needham & Company – Analyst

I guess following up on that, can you respectively define them? And then also to bring up 101, I wonder if you can maybe elaborate a bit about - Paul, you mentioned earlier a good idea of how 101 maybe associated with some of the side effects. I wonder if you can elaborate on that, too. Thanks.

**Paul Grint** Regulus Therapeutics Inc – President, CEO

Yes. Let me - thank you. Let me check with the last one. Yes. We're not talking in details. So, I mean, clearly, when we were put on clinical hold by the FDA, they asked us to do a number of things which was just to remind you, one, provide a detailed safety summary from all the ongoing studies which obviously we're able to do.

Investigate potential mechanisms, so we've really done a lot of pre-clinical work and we haven't seen any changes in bilirubin in this pre-clinical studies. But we did continue to investigate and I think we found some interesting biology that we've obviously been working on in compiling some of that to form the basis of that part of the response.

And there were other components of the response, including I think from our standpoint a great request which was defining the risk benefit of RG-101. And just to remind you, we were very excited when we did the collaboration with GSK in heading towards sort of one - circle one visit cure, the injection-based therapy in a single visit. A part with that GSK still remains very, very interested obviously in 101, continued to collaborate but we cannot do that until we get off hold.

So basically we're not going to give a lot more detail at this point. I mean, that's going to be in the package and we'll see how the FDA responds to that in the first quarter next year.

116.   This information was materially misleading because it told investors that Regulus already had the information requested by the FDA and based on their

findings, FDA would likely still grant approval of RG-101. However, in reality, Regulus used this exact data to determine that RG-101 was the mechanism of hyperbilirubinemia.

117.   The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in higher levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material.

*January 27, 2017 – Press Release*

118.   On January 27, 2017, Regulus issued a press release titled "Regulus Announces Continuation of RG-101 Clinical Hold," and filed a Form 8-K with the SEC announcing that Regulus had received written communication from the FDA outlining information required to resolve the clinical hold for its Investigational New Drug (IND) for RG-101. The press release stated in relevant part:

> the U.S. Food and Drug Administration ("FDA") has informed us that the full clinical hold placed on our RG-101 clinical development program in June 2016 will remain in effect pending the FDA's review of certain pre-clinical and clinical information to be submitted by us to the FDA, including **a final preclinical study safety report for RG-101**, final efficacy and safety data from certain clinical trials of RG-101, additional expert opinion of liver safety data in light of the proposed mechanism of hyperbilirubinemia, and an updated risk/benefit assessment of the proposed therapeutic regimens using RG-101.
>
> We currently anticipate submitting a complete response to the FDA with the requested information in the fourth quarter of 2017. There can be no assurances as to when the clinical hold on RG-101 may be lifted, if at all.

119.   The above information revealed to the market that despite Regulus' reassurances that the FDA would find RG-101 safe, the FDA would continue its investigation. Importantly, the FDA requested a final preclinical study safety report that would eventually be used to determine that RG-101 was the mechanism for hyperbilirubinemia in the patients.

120.   On the release of this news, Regulus' share price declined from $2.25 per share of stock at close on January 27, 2017, to close at $1.30 per share on January 30, 2017, the next trading day. This resulted in a drop of approximately 53.3% on unusually heavy volume.

<u>March 2, 2017 – Press Release</u>

121.   On March 2, 2017, Regulus issued a press release announcing financial results for the year end 2016. The press release stated in pertinent part:

**RG-101 for the treatment of HCV**

- Today, Regulus reported top-line results from the primary endpoint analysis of its completed Phase II study of RG-101 in combination with 4 weeks of once/daily approved anti-viral agents Harvoni®, Olysio®, or Daklinza™.  The study enrolled 79 treatment naïve genotype 1 and 4 HCV patients (Harvoni® combination arm, n=27, Olysio® combination arm, n=27, Daklinza™ combination arm, n=25).  The results from this final analysis demonstrated significant virologic response through 48 weeks of follow-up:  RG-101 plus Harvoni demonstrated 100% SVR48; RG-101 plus Olysio demonstrated 77% SVR48; and RG-101 plus Daklinza™ demonstrated 84% SVR48. There were 10 relapses: six in the Olysio® combination arm (weeks 8, 20, 24 and 32); and four in the Daklinza™ combination arm (weeks 8, 12 and 24).   RG-101 in combination with four weeks of oral DAA therapy was generally well tolerated with the majority of adverse events (AEs) considered mild or moderate with no AE-related discontinuations.  Commonly reported AEs included fatigue, headache, and injection site reactions. **There were four patients across all arms that experienced adverse events of asymptomatic transient hyperbilirubinemia (greater than or equal to two times the upper limit of normal).** No cases met criteria for Hy's law. Over the course of the one-year study, five subjects reported serious adverse events (SAE).   As previously reported, there was **a single SAE of jaundice in a patient at seven weeks in the Daklinza™ combination arm of the study.**  Since the interim analysis in June 2016, there were two additional SAEs: one was a trauma-

related knee injury; and the other was an upper respiratory infection.

- In January, the Company reported that it received written communication from the FDA that the clinical development program from RG-101 remains on clinical hold. The FDA has requested the final safety and efficacy data from all on-going RG-101 pre-clinical and clinical studies before reconsidering the clinical hold. These data are anticipated to be available in Q4 2017.

122.   Although Regulus and Grint tried to down-played the four additional cases of hyperbilirubinemia, these results revealed to the market that hyperbilirubinemia was a common side effect of RG-101.

### *March 2, 2017 – Earnings Call*

123.   On March 2, 2017, Regulus held a conference call in connection with the Press Release announcing the FDA hold. Regulus stated:

**[Tim Wright]**

Now on to RG-101. We were disappointed with the FDA's decision to continue the clinical hold. We felt that our response to the FDA's questions were comprehensive that we had identified potential mechanism for the hyperbilirubinemia and proposed a reasonable path forward.

That said, we are pleased to share with you the summary of the topline results from our recently completed Phase 2 RG-101 direct acting antiviral combination study or DAA combo study. To refresh you on the design, this was a Phase 2 study of RG-101 in combination with four weeks of once daily approved antiviral agents. Harvoni, Olysio or Daklinza. The study enrolls 79 treatment naïve genotype one and four HCV patients. The results from the final analysis demonstrated the sustained virologic response through 48 weeks to follow up SVR48 as follows;

RG-101 plus Harvoni demonstrated 100% SVR48; RG-101 plus Olysio demonstrated 77% SVR48; and RG-101 plus Daklinza demonstrated 84% SVR48. RG-101 in combination with four weeks

of oral DAA therapy **was generally well tolerated with the majority of adverse events considered mild or moderate** with no AE-related discontinuations. Commonly reported adverse events included fatigue, headache, and injection site reactions.

Over the course of the one-year study, five subjects experienced SAEs. As previously reported, there was **a single SAE of jaundice in a patient at seven weeks in the Daklinza combination arm of the study.** There were **four patients across all arms that experienced adverse events of asymptomatic transient hyperbilirubinemia greater than or equal to two times the upper limit of normal.**

No cases met criteria for Hy's law. Since the interim analysis in June 2016 that we reported on last year, there were two additional SAEs: one was a trauma-related knee injury; and the other was an upper respiratory infection.

**Matthew Luchini – Analyst for BMO Capital Markets**

Okay, thank you. And just on RG-101, it seems like obviously there has been a couple more SAEs and maybe you could just remind us or talk us through not only what we are seeing but also with the cases of the elevated bilirubin, which specific combo arms these different events were seen?

**Paul Grint**

So as I mentioned there was only one SAE for hyperbilirubinemia and jaundice in this study and that was on the Daklinza arm, where the others were distributed - the other adverse events which were at the level of asymptomatic laboratory abnormalities, we are seeing across all of the arms, so **the additional four subjects who had bilirubin changes were across the other arms**, so that's all the detail we're providing at this stage, **they were asymptomatic and laboratory abnormalities that were transient**.

**Matthew Luchini**

Okay. So I should interpret that to me in the every arm had at least one asymptomatic elevation?

**Paul Grint**

Yes.

124.   Although Regulus and Grint tried to down-played the four additional cases of hyperbilirubinemia, these results revealed to the market that hyperbilirubinemia was a common side effect of RG-101.

125.   In response to a question about the FDA, Grint responded:

**Nick Bennett – Analyst from Wells Fargo**

I think in previous quarter, I think it was Tim outlined five specific points you're going to address. Obviously there was some PK and feedback from, asymptomatic experts as well as detailed mechanism of potential mechanism action data. So have all of those essentially been addressed just with one we want to see the final 48-week data from all clinical studies.

**Paul Grint**

You're correct Nick. So if you go back the original hold and the request there were five components and it was an overall detailed human clinical safety analysis across all the studies, it was **obviously preclinical data** and work to see if you could identify mechanism. It was get extra safety review and also included the PK from the renal compromise study and finally importantly they asked us to provide the benefit risk on the program. All those components were in the complete response that we submitted to the FDA.

**Nick Bennett**

And did you get response back from each of those or is just FDA felt like we want to see more safety data?

**Paul Grint**

The response back from the FDA was you know - you remain on clinical hold and we would like to see as we described the full 48 week protocol data from both our preclinical and clinical studies that are ongoing. And additional expert review and commentary on our

50

proposed potential mechanism that we believe is associated with these cases of increased bilirubin.

126.   In connection with the call Regulus also published a PowerPoint presentation. Within the PowerPoint presentation, Regulus revealed to investors that "5 subjects reported serious AEs, including 1 SAE **considered related to study drug** (jaundice/liver injury)."

127.   The above information revealed to investors that hyperbilirubinemia was a main side effect of the study.

### *March 2, 2017 – Form 10-K*

128.   On February 23, 2016, Regulus filed a Form 10-K with the SEC announcing Regulus' financial and operating results for the fiscal fourth quarter and fiscal year ended December 31, 2016 ("FY 2016 10-K"), which was signed and certified under the Sarbanes Oxley Act of 2002 by Grint and Hagan.

In August 2015, we initiated a Phase II study investigating RG-101 in a shortened, four-week treatment regimen containing a subcutaneous administration of 2 mg/kg of RG-101 at Day 1 and Day 29, in combination with one of three oral direct-acting antiviral agents Harvoni®, Olysio®, and Daklinza® for 28 days. In March 2017, we reported top-line results from the primary endpoint analysis of its completed Phase II study of RG-101 in combination with 4 weeks of once/daily approved anti-viral agents Harvoni®, Olysio®, or Daklinza™. The study enrolled 79 treatment naïve genotype 1 and 4 HCV patients (Harvoni® combination arm, n=27, Olysio® combination arm, n=27, Daklinza™ combination arm, n=25). The results from this final analysis demonstrated significant virologic response through 48 weeks of follow-up: RG-101 plus Harvoni demonstrated 100% SVR48; RG-101 plus Olysio demonstrated 77% SVR48; and RG-101 plus Daklinza™ demonstrated 84% SVR48. There were 10 relapses: six in the Olysio® combination arm (weeks 8, 20, 24 and 32); and four in the Daklinza™ combination arm (weeks 8, 12 and 24). RG-101 in combination with four weeks of oral DAA therapy **was generally well tolerated with the majority of adverse events (AE) considered mild or moderate** with no AE-related discontinuations. Commonly reported AEs included fatigue, headache, and injection site reactions. There were four patients across

51

all arms that experienced AEs of asymptomatic transient hyperbilirubinemia (greater than or equal to two times the upper limit of normal). No cases met criteria for Hy's law. Over the course of the one-year study, five subjects reported serious adverse events (SAE). As previously reported, there was a single SAE of jaundice in a patient at seven weeks in the Daklinza™ combination arm of the study. Since the interim analysis in June 2016, there were two additional SAEs: one was a trauma-related knee injury and the other was an upper respiratory infection.

\*     \*     \*

In January 2016, we initiated a multi-center, open label, non-randomized Phase I study to compare the safety, tolerability, pharmacokinetics, and pharmacodynamics of 2 mg/kg of RG-101 in subjects with severe renal insufficiency or end-stage renal disease (ESRD) to healthy control subjects, and further explore RG-101 in hepatitis C infected subjects with severe renal insufficiency or ESRD.  The Phase I study has three treatment arms (n=24): (i) healthy volunteers (n=8); (ii) patients with severe renal impairment or ESRD (n=8); and (iii) HCV patients with severe renal impairment or ESRD (n=8). Enrollment was completed in the second quarter of 2016, and the trial was completed in the first quarter of 2017.

In June 2016, we received verbal notice from the U.S. Food and Drug Administration, or FDA, that our IND for RG-101 for the treatment of chronic HCV infection had been placed on clinical hold. The FDA initiated the clinical hold after a second patient experienced an SAE of jaundice. This SAE occurred in an HCV patient with end-stage renal disease on dialysis enrolled in our on-going Phase I US study 117 days after receiving a single dose of RG-101. In July 2016, we received a formal clinical hold letter from the FDA requesting the following from us: detailed safety data analysis from preclinical and clinical studies; exploration of potential mechanisms of hepatoxicity in non-clinical models; review and input from independent hepatotoxicity experts; additional PK data from the US Phase I study; and a risk/benefit assessment for the proposed therapeutic regimen containing RG-101. In December 2016, we submitted a complete response to the FDA's initial request for information, which included identification of a potential mechanism of hyperbilirubinemia. The Company also submitted a proposal to mitigate this risk. In January 2017, the Company received written communication from the FDA that the clinical development program for RG-101 remains on clinical

52

hold. The FDA has requested the final safety and efficacy data from on-going RG-101 clinical **and preclinical** studies before reconsidering the clinical hold. These data will be available once the current study protocols are complete through 48 weeks of follow up, which is anticipated in the fourth quarter of 2017. The FDA also requested additional expert review of liver safety data in light of the proposed mechanism of hyperbilirubinemia. We plan to work diligently with the FDA to seek the release of the clinical hold. Initiation of new RG-101 clinical studies are suspended pending resolution of the FDA clinical hold.

129. The above statements identified in emphasis were materially false and misleading. Defendants' statements hid from investors that RG-101 caused jaundice and hyperbilirubinemia in test patients. Defendants knew that RG-101 was unsafe but misled investors by indicating that RG-101 had been "well tolerated with the majority of adverse events considered mild or moderate."

130. The safety of RG-101 was essential to its success. Had investors been told that RG-101 resulted in higher levels of bilirubin, they would have been able to assess the risks associated with RG-101 and investing in Regulus. The information omitted from Defendants' above-statements was, therefore, material.

### *May 4, 2017 – Press Release*

131. On May 4, 2017, after the market closed, Regulus published a Press Release announcing the depature of CEO Grint. The Press Release stated in pertinent part:

On May 4, 2017, Paul C. Grint, M.D. resigned as our President and Chief Executive Officer and as a director, effective immediately. Dr. Grint has also withdrawn himself as a nominee for director at our 2017 annual meeting of stockholders. In connection with his resignation, and subject to our receiving an effective release and waiver of claims from Dr. Grint, Dr. Grint will receive (1) a lump sum severance payment equal to 12 months of his base salary in effect at the time of his resignation, (2) a lump sum cash amount equal to 229.56% multiplied by the total cost of the projected premiums for group medical, dental and vision insurance for a period of 12 months and (3) vesting acceleration of all outstanding options or other equity

incentive awards held by Dr. Grint that are subject to time-based vesting as of the time of his resignation. In addition, subject to Dr. Grint's consent and our receipt of an effective release and waiver of claims from Dr. Grint, the post-termination exercise period of all outstanding options held by Dr. Grint will be extended to one year following the date of his resignation.

132.   In connection with the Press Release, on May 4, 2017, after the market closed, Regulus held an earnings call to announce financial results and the departure of CEO Grint. Regulus stated:

**[Grint]**

In the first quarter, following the announcement of continuation of the RG-101 clinical hold, we took a very close look at our portfolio and prioritized our most promising programs and stopped earlier-stage development in areas that were more exploratory in nature in order to extend our cash runway through potential significant milestones in 2018.

As a result of this review, we have today announced and are currently implementing a corporate restructuring to streamline our operations. As part of this restructuring, I have made the decision to resign as President, CEO and the Director of Regulus. When I joined Regulus almost 3 years ago, I was excited by the size of microRNAs. Today, as I leave the company, and based on our experience gained over the past 3 years, I still believe in the potential to generate important medicines by targeting microRNAs. I wish Jay and the entire Regulus team every success for the future and look forward to watching the scientific and clinical success of the portfolio and the company. Jay?

**Alan Carr - Needham**

A couple. I wanted to clarify which programs are still going to be active. Is it just narrowed down to 012 and then 5040 and 4326 with some waiting on 101? Are those the only 4 internal programs that are going to be continued? Or is there going to be some - or is there some other programs behind that? And I guess a bigger picture, concerning the change in management here. How should we interpret, Paul, your departure today?

CONSOLIDATED CLASS ACTION COMPLAINT
Master File No. 3:17-cv-00182- BTM-RBB

**Jay Hagan**

Yes, sure. Alan, the company, I think we've talked about in the past, historically had a pretty broad exploratory footprint. And **as we face the clinical hold** and the need to conserve resources, **we took a very careful look at where we were spending money**. The programs that we're talking about and focusing our resources are not ones that have been broadly disclosed. So it's more just putting a tighter set of scrutiny on the rationale for pursuing certain targets before we spend significant capital on them. And that's why today's announcement, while reducing our employee-related costs, we're not indicating any cost savings from additional program terminations.

133.   The above information revealed to the market that former CEO Grint was fired in connection with cost saving and that RG-101 would potentially be discontinued.

134.   On the release of this news, the price of Regulus' common stock declined from $1.70 per share at the close on May 4, 2017, to open at $1.20 per share at open on May 5, 2017, a drop of approximately 29.4%.

### June 12, 2017 – Press Release

135.   At 7:00am ET on June 12, 2017, before trading hours, Regulus issued a press release and later filed a Form 8-K with the SEC announcing that Regulus was discontinue clinical development of RG-101. The Press Release stated in pertinent part:

Comprehensive pre-clinical investigation and thorough evaluation of the clinical data from RG-101 has led to the identification of a bilirubin transport mechanism as the likely cause for the cases of hyperbilirubinemia in the RG-101 program. We believe that a combination of factors including inhibition of conjugated bilirubin transport by RG-101, impaired baseline bilirubin transport in HCV patients and the preferential uptake of RG-101 by hepatocytes contributed to this mechanism. Additional patient specific contributing factors cannot be excluded. Applying the learnings from the RG-101 program, alternative compounds targeting miR-122 have been identified that maintain potent HCV antiviral activity while

55

lacking inhibition of the bilirubin transporter. These compounds have the potential for rapid clinical proof-of-concept of a novel, markedly shortened treatment regimen for HCV and will be considered for further development pending an updated global commercial market assessment for HCV.

136.   This finally revealed to the market that RG-101 was, in fact, the cause for the cases of hyperbilirubinemia in the study. This also revealed that despite Regulus' assurances that RG-101 was safe, that was not the case and as a result, Regulus was forced to discontinue clinical development of RG-101.

137.   On the release of the news, the price of Regulus' common stock declined from $1.40 per share at closing on June 9, 2017, to open at $1.10 per share at open on June 12, 2017, a drop of approximately 21.4%.

## SCIENTER ALLEGATIONS

138.   As alleged herein, Defendants acted with fraudulent intent and/or deliberate recklessness when making the above misrepresentations and material omissions. As explained in detail below, Defendants had conducted pre-clinical research that was ultimately relied on to determine the hyperbilirubinemia mechanism, closely monitored the RG-101 study, and were intimately familiar with the RG-101 technology. Defendants also had motive to defraud investors. When the truth finally emerged, Regulus terminated the employment of Grint, Regulus' CEO. The critical nature of RG-101 strongly supports the conclusion that, at the very least, Regulus acted with scienter under the corporate scienter doctrine.

### A. Defendants Knew that RG-101 was Unsafe and Resulted in Jaundice and Hyperbilirubinemia

139.   The Individual Defendants knew that RG-101 was the underlying mechanism of hyperbilirubinemia in the test patients but misled investors anyway. For example, Regulus announced that a "[c]omprehensive pre-clinical investigation" helped to determine that RG-101 caused hyperbilirubinemia. The Individual Defendants, consisting of Grint, Hagan, and Huang, had access to this pre-clinical

information before the start of the Class Period and therefore knew about the risks surrounding hyperbilirubinemia.

140. Grint also specifically downplayed the likelihood of RG-101 being the cause hyperbilirubinemia despite direct results from its investigator that RG-101 was "probably" the cause. Throughout the Class Period, Grint made comments like:

- [F]rom what we've seen so far, we're certainly not worried about the safety profile of RG-101 or in fact the reported SAEs. As we mentioned last week, both of these occurred in the treatment follow-up period, both these patients received treatment and neither patient discontinued from the study.

- Just to remind you, these are patients that have chronic hepatitis C, they have multiple other co-morbid conditions, and we're following them for very prolonged periods of time, and we'd expect to see other things reported over a follow-up period.

- In addition to chronic hepatitis C, the patient had poorly controlled diabetes, requiring insulin therapy, and a history of alcohol abuse. The patient has since recovered and is continuing to participate in this trial and is now over six months out following completion of HCV therapy with a viral load below the limit of quantification.

- This second serious adverse event of jaundice occurred 117 days after receiving a single dose of RG-101 in our Phase 1 US IND study in an HCV patient who also had end-stage renal disease requiring dialysis. In addition to his renal insufficiency and HCV infection, this patient also had poorly controlled type II diabetes requiring insulin therapy, coronary artery disease with prior open-heart surgery, high cholesterol, high blood pressure, and recent herpes zoster infection requiring the oral antiviral, Acyclovir. The patient is on over a dozen concomitant medications, including blood pressure medications, statin therapy, and insulin.

- In reviewing the literature on other recent HCV programs, including marketed DAAs, we note that the rate of clinically significant changes in bilirubin in our program are consistent with what has been seen in other programs in the population of patients with significant liver disease.

- But I will say that their gallbladders, both of them their gallbladders on ultrasound imaging were not normal, if you see what I mean?

141.   These statements continually downplayed the likelihood of RG-101 being the cause of hyperbilirubinemia. The Individual Defendants continual statements about other factors that were more likely to contribute to the jaundice, all while having reports indicating that RG-101 was "probably" responsible, misled investors as to the safety of RG-101 and RG-101's role in the SAE.

142.   Further evidence that the Individual Defendants knew that RG-101 was dangerous is the fact that RG-101 was, by all accounts, the most important aspect of Regulus' operations, *i.e.*, the "core" operation.

143.   While RG-101 may have proved effective, it was by no means safe. RG-101 resulted in extreme cases of hyperbilirubinemia.  Notwithstanding the fact that the Individual Defendants had a report stating that RG-101 was "probably" the cause, the Individual Defendants continued to represent to investors that it was in fact other factors.

144.   Given the critical importance of RG-101, Defendants closely monitored its safety and efficacy and therefore knew that RG-101 posed a serious safety risk.

145.   Proof that the Individual Defendants closely monitored and were aware of the development of RG-101 is evident in the constant safety updates and the fact that Regulus announced that they already had most of the information requested from the FDA. This shows that Regulus had internal information that was used to show that the mechanism of hyperbilirubinemia was RG-101.

146.   Accordingly, Regulus and the Individual Defendants knew that RG-101 was not safe.

### B. Defendants Benefitted Financially From the Fraud

147. Defendants were motivated to commit fraud. Regulus ability to continue as a going concern was in jeopardy. For example, Regulus stated,

> If we are unable to raise additional capital when required or on acceptable terms, we may be required to:
>
> - significantly delay, scale back or discontinue the development or commercialization of any future product candidates;
> - seek strategic alliances for research and development programs at an earlier stage than otherwise would be desirable or on terms that are less favorable than might otherwise be available; or
> - relinquish or license on unfavorable terms, our rights to technologies or any future product candidates that we otherwise would seek to develop or commercialize ourselves.
>
> If we are required to conduct additional fundraising activities and we are unable to raise additional capital in sufficient amounts or on terms acceptable to us, we will be prevented from pursuing development and commercialization efforts, which will have a material adverse effect on our business, operating results and prospects.

148. By concealing the risks associated with RG-101, Defendants were able to obtain additional funds via debt financing.

149. Regulus has never generated any revenue from product sales and relies optimism surrounding its drugs in order to generate financing to continue as a going concern. As stated by Regulus, "[t]he size of our future net losses will depend, in part, on the rate of future expenditures and *our ability to obtain funding through equity or debt financings, strategic alliances or grants*." Therefore, it was imperative that their main drug was successful in order to generate interest and raise funds.

150. To generate the funds necessary to continue the RG-101 clinical trials, on June 17, 2016, Regulus entered into a loan and security agreement with Oxford Finance, LLC, or Oxford, pursuant to which Oxford agreed to lend up to $30.0 million, issuable in two separate term loans of $20.0 million (the Term A Loan) and

$10.0 million (the Term B Loan). On June 22, 2016, Regulus received $20.0 million in proceeds from the Term A Loan, net of debt issuance costs.

151.   Regulus' motive in this regard was not akin to the general corporate objective of raising capital shared by all companies. Regulus would not have been able to take out this loan if the omitted information about RG-101 had been disclosed. Regulus, therefore, realized a concrete benefit of $43.2 million as a result of the fraud.

152.   The Individual Defendants also benefited personally as a result of the fraud. For the year 2016 Grint received a salary of $515,000 plus other awards resulting in $2,869,634. For 2015, Grint received a salary of $446,532 plus other awards resulting in total compensation of $5,006,729. Hagan received a 2016 salary of $413,610 plus other awards resulting in $3,950,279.

153.   This compensation was material given that Regulus had no revenue. By engaging in the fraud alleged herein, the Individual Defendants benefitted themselves financially in a personal and specific manner.

### C. Regulus Fired CEO Paul Grint, M.D.

154.   Regulus' decision to fire its former CEO, Grint further implicates Defendants as having acted with scienter.

155.   Grint was responsible for the majority of the false statements alleged herein. Following the FDA clinical hold and just prior to Regulus' decision to permanently discontinue all trials involving RG-101, Regulus terminated Grint. Regulus announced its decision to terminate Grint's position in a current report (Form 8-K) filed with the SEC on May 4, 2017.

156.   Regulus terminated Grint's employment with them in response to the conduct alleged herein. The nature and timing of Regulus' decision to terminate Grint evidences this fact, as explained below:

- Regulus terminated Grint just one month before announcing that it was discontinuing development of RG-101 due to the risk of hyperbilirubinemia.

60

The temporal proximity between Regulus' announcement and Grint's termination suggests that the latter was directly related to the former;

- Grint was responsible for the majority of the fraudulent statements alleged herein. The fact that Regulus terminated Grint shows that wrongdoing occurred at Regulus, and that Grint was responsible for the wrongdoing in some material way;

- The current report did not contain any of the typical salutary words often found in corporate statements announcing high-level resignations, which suggests strongly that Grint's departure from Regulus was involuntary and for cause; and

- Regulus did not pay Grint a bonus for work performed during 2016, whereas Hogan received $100,000 and Wright received $110,000.

157.   Regulus' decision to terminate Grint's employment shows that wrongdoing occurred in connection with the RG-101 studies, which further supports the inference that Defendants acted with scienter.

### D. Corporate Scienter

158.   Regulus' public statements about RG-101 were critical to its reputation and overall operations. Given the dramatic allegations of falsity contained herein, a strong inference exists that Regulus' corporate officials knew of the falsity of the statements at the time of publication. Specifically, the knowledge of Regulus' former CEO Grint, which included the fact that RG-101 caused a harmful increase in bilirubin, is imputed to Regulus. Regulus acted with scienter under the corporate scienter doctrine

### LOSS CAUSATION AND ECONOMIC LOSS

159.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Regulus' stock price, and operated as a fraud or deceit on acquirers of Regulus' common stock. As detailed above, when the truth about Regulus' misconduct and its

61

lack of operational and financial controls was revealed, the value of Regulus' common stock declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Regulus' share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Regulus-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate Regulus' stock price and the subsequent significant decline in the value of its share price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

160. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the safety of RG-101 and thus Regulus' business and prospects, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Regulus' common stock to be artificially inflated. Plaintiff and other Class members purchased Regulus' common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

161. At all relevant times, the market for Regulus common stock was an efficient market for the following reasons, among others:

(a)     Regulus securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

(b)     During the Class Period, Regulus common stock was actively traded, demonstrating a strong presumption of an efficient market;

(c)     As a regulated issuer, Regulus filed with the SEC periodic public reports during the Class Period;

(d)     Regulus regularly communicated with public investors via established market communication mechanisms;

(e)     Regulus was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f)     Unexpected material news about Regulus was rapidly reflected in and incorporated into Regulus' stock price during the Class Period.

162.   As a result of the foregoing, the market for Regulus common stock promptly digested current information regarding Regulus from all publicly available sources and reflected such information in Regulus' stock price. Under these circumstances, all purchasers of Regulus common stock during the Class Period suffered similar injury through their purchase of Regulus' common stock at artificially inflated prices, and a presumption of reliance applies.

163.   Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered Regulus' true net losses and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in Regulus.

**NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION**
**DOCTRINE**

164.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

165.   To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

166.   Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Regulus who knew that the "forward-looking statement" was false. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

**CLASS ACTION ALLEGATIONS**

167.   Plaintiff brings this action on behalf of all individuals and entities who purchased acquired Regulus common stock on the public market during the Class Period, and were damaged, excluding Regulus, the Individual Defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

168.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of Regulus' common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate

discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Regulus or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of April 28, 2017, Regulus had 53,182,330 outstanding shares of common stock. Upon information and belief, these shares are held by thousands if not millions of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

169.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

170.   Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

171.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)       whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)       whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements concerning RG-101;

(c)       whether the price of Regulus securities during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)       whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

172.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

173.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

174.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Regulus common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

175.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Regulus' common stock in an effort to maintain artificially high market prices for Regulus securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

176.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material

66

information about RG-101 and thus the business and future prospects of Regulus as specified herein.

177.   These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Regulus' value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about RG-101 and Regulus' business and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Regulus common stock during the Class Period.

178.   Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at Regulus during the Class Period and members of Regulus' management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of Regulus, was privy to and participated in the creation, development and reporting of Regulus' SEC filings and public statements concerning RG-101; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of Regulus' management team, internal reports and other data and information about Regulus' drug candidates, including RG-101, at all relevant times; and (4) each Individual Defendant was aware of Regulus' dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

179.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing RG-101's safety issues and thus Regulus' business and future prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misrepresentations concerning the safety of RG-101 throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

180.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Regulus' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Regulus' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Regulus' securities during the Class Period at artificially high prices and were or will be damaged thereby.

181.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding RG-101, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Regulus

common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

182.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

183.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Regulus' common stock during the Class Period.

184.   This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## COUNT II

### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

185.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

186.   The Individual Defendants acted as controlling persons of Regulus within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Regulus' operations and/or intimate knowledge of the false financial statements filed by Regulus with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Regulus, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of Regulus' reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

187.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Regulus and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

188.   As set forth above, Regulus and the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

189.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Regulus' common stock during the Class Period.

190.   This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)   Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)   Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)   Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: December 22, 2017                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton (SBN 316506)
Adam C. McCall (SBN 302130)
Email: aapton@zlk.com
Email: amccall@zlk.com
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel: (213) 985-7290

-and-

Nicholas I. Porritt
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Tel:    (202) 524-4290
Fax:   (202) 333-2121
(*pro hac vice application forthcoming*)

*Attorneys for Lead Plaintiffs and the Class*